

FILED IN OPEN COURT

DEC 11 2018

CLERK, U.S. DISTRICT COURT
NORFOLK, VA

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Criminal Case No. 2:18cr163 |
| ) | |
| STEVEN ERIC KREMER, ) | |
| ) | |
| Defendant. ) | |

## STATEMENT OF FACTS

By signing below, the parties stipulate that the allegations in the Criminal Information and the following facts are true and correct, and that had the matter gone to trial the United States would have proven them beyond a reasonable doubt, by competent and admissible evidence.

### Background Information

At all times relevant to the charge outlined in the Criminal Information:

1. STEVEN ERIC KREMER, the defendant, was employed as the Chief of the Range and Mission Management Office (RMMO), Suborbital and Special Orbital Projects Directorate at the National Aeronautics and Space Administration (NASA) Wallops Flight Facility (WFF). WFF is located on Wallops Island, Virginia, which is within the Eastern District of Virginia. KREMER's position as the Chief of the RMMO was a civilian GS-15 level position.

2. The RMMO was responsible for administering the Range Operations Contract (ROC) – a cost-plus-award fee multi-year contract intended to provide full-scope program management range services, including operations and maintenance and support services at launch and test facilities and launch control centers. The ROC is valued at approximately $191,000,000 and is comprised entirely of federal funds. Prior to assuming his position as the Chief of the RMMO, KREMER was employed as the Deputy Chief of the RMMO and the Contracting

Officer's Representative for the ROC.

3. Contracting Firm #1 (Firm #1) is an aerospace engineering services company located in Columbia, Maryland, that delivers space and ground range services and base facility services to the Department of Defense, NASA, and civil customers. Firm #1 holds several contracts for operation and maintenance efforts at the WFF, and was the prime contractor for the ROC.

4. Sub-contracting Firm #2 (Firm #2) is a privately-held small business located in Annapolis, Maryland, that provides commercial furniture and interior design services to local, state, and federal government agencies. Firm #2 performed interior design and office furnishing services and equipment at the WFF through the operation and maintenance contracts held by Firm #1, including under the ROC. SC was employed by Firm #2 and was the primary point of contact between Firm #2 and WFF staff.

A. <u>KREMER's Use of SC's Beach House and Work Directed to SC and Firm #2.</u>

5. From in or about 2008, and continuing until in or around July 2015, in the Eastern District of Virginia and elsewhere, the defendant, STEVEN ERIC KREMER, as a public official, otherwise than as provided by law for the proper discharge of official duty, directly or indirectly demanded, sought, received, accepted, and agreed to accept or receive anything of value from SC personally for and because of any official act performed and to be performed by him, that is, facilitating the use of SC and Firm #2 to supply interior design services and office furniture for WFF.

6. SC owns a beach house in Cape Charles, Virginia. For a one week period during each of the summers between 2008 and 2015, SC provided KREMER the free use of this vacation home. During that same timeframe, KREMER facilitated the award of interior design and

2



furnishing projects for SC and Firm #2 to complete for WFF.

7. For example, from on or about July 10, 2009, through July 15, 2009, SC provided KREMER the free use of her beach house, valued in the amount $1,915.00.

8. On Tuesday, July 14, 2009, while staying at SC's vacation home, KREMER sent SC an email noting that "after this week, I'm going to be searching for rooms even those that no one uses at Wallops and put new furniture in them. I owe u big time. This has been so super."

9. On Tuesday, August 18, 2009, KREMER sent SC an email regarding another interior design project for SC and Firm #2. Specifically, KREMER noted that he had found SC a "New customer," and that this new project would require the installation of "consoles and chairs and perhaps other things." The next day, SC sent a responsive email, which concluded "I'm going to have to pay you finders fees!"

10. From on or about July 10, 2010, through July 17, 2010, SC provided KREMER the free use her vacation home, valued in the amount $2,450.00.

11. On Thursday, June 23, 2011, KREMER sent SC an email regarding another interior design project for SC and Firm #2. Titled "Another job," KREMER directed SC to go to a particular office that two WFF employees shared and "Set them up for anything they want. Wait till u see it."

12. On Wednesday, July 20, 2011, KREMER sent SC an email regarding another interior design project for SC and Firm #2. Under the subject "More Work," KREMER stated "Got another job for you," then directed SC to a particular part of WFF that would need "offices and 'lab' space."

13. From on or about August 14, 2011, through August 21, 2011, SC provided KREMER the free use of the beach house, valued in the amount $2,450.00.



14. On Wednesday, March 21, 2012, KREMER sent SC an email regarding another interior design project for SC and Firm #2. KREMER stated "I am trying to get a huge job for you and we can talk about it when you get here. It will take some competitive pricing though but I have confidence in you." SC responded "Yeah! thanks for thinking of me."

15. On Saturday, April 28, 2012, KREMER sent SC an email regarding both another interior design project for SC and Firm #2, as well as requesting another week at SC's beach house. Specifically, KREMER wrote:

> "Can I book a week like last year? I will give you some days this week if that is OK.
>
> Also, I want to make sure we coordinate for the new Launch Control Center. I have asked for $1.5M in outfitting costs for IT stuff and furniture. I think in a few months, once the floor plans are done, I will want to sit down with you and go over possibilities. This one will be big for you but I'm sure you can handle it.
>
> THANK YOU so much again. Your customer service is unmatched.....not to mention the summer fun you offer. LOL."

16. From on or about August 12, 2012, through August 19, 2012, SC provided KREMER the free use of her vacation home, valued in the amount $2,450.00.

17. On Thursday, April 4, 2013, KREMER sent SC an email regarding another interior design project for SC and Firm #2. Under the subject "More work," KREMER stated "Have some more offices on the island in [a particular WFF building] I need you to make better." SC responded "Yay!"

18. From on or about August 10, 2013, through August 17, 2013, SC provided KREMER the free use of a vacation home located in Cape Charles, Virginia, valued in the amount $2,450.00.



19. On Wednesday, March 5, 2014, KREMER sent SC an email regarding another office furnishing project for SC and Firm #2. Kremer stated "Go ahead and work this please. Trying to get you as much work as possible . . ." That same day, SC responded "And I appreciate that! I just don't want to cause any waves for anyone."

20. From on or about July 6, 2014, through July 12, 2014, SC provided KREMER the free use of a vacation home located in Cape Charles, Virginia, valued in the amount $2,100.00.

21. From on or about July 12, 2015, through July 18, 2015, SC provided KREMER the free use of a vacation home located in Cape Charles, Virginia, valued in the amount $2,450.00.

22. The approximate value of SC's vacation home for each of KREMER's week-long stays between 2008 and 2015 totaled $17,820.00.

23. From in or about October 2010, through in or about January 2016, Firm #1 paid Firm #2 for decoration, design, and furniture subcontracting work at the WFF performed under the Firm #2 subcontract with Firm #1 and, in turn, SC received commission payments from Firm #2 for work for the WFF.

B. <u>KREMER and SC's Conspiracy to Purchase Personalized Art for KREMER's Home Using ROC Funds.</u>

24. Beginning in October 2011, KREMER asked SC to procure a piece of personalized art. SC agreed and obtained an estimate for the costs of production for the piece.

25. KREMER directed SC to bill this piece of art to the ROC, but to conceal the true nature of the purchase. On Friday, October 21, 2011, KREMER sent an email to SC directing: "Don't state that on the quote please. We need to call it something else." SC responded "I did not; listed it as a whiteboard. Not my first time at the rodeo!" The next day, KREMER sent SC an email noting that it would "look suspicious" to deliver the piece of art at the same time as



legitimately-purchased goods. He then joked "We can work that out in a dark alley in DC. Haha."

26. In or about mid-December 2011, SC delivered the personalized artwork to KREMER, along with other interior design supplies for KREMER's personal use.

27. On December 15, 2011, SC caused Firm #2 to submit an invoice for $1,000.00 for two whiteboards to Firm #1, to be billed to the ROC. By Purchase Order PO-0000929, this invoice was approved and, on January 31, 2012, Firm #1 received $1,000.00 of ROC funds for this purchase. Firm #1 transmitted these funds to Firm #2.

C. <u>KREMER's Use of ROC Funds to Purchase of Gift Cards for His Personal Use.</u>

28. Beginning in or about 2012, in the Eastern District of Virginia and elsewhere, the defendant, STEVEN ERIC KREMER, knowingly did steal and purloin something of value to the United States, to wit, ROC funds, with a value of greater than $1,000.00.

29. In his capacity as Chief of the RMMO and the Contracting Officer's Representative for the ROC, KREMER used "Project 100 RMMO Strategic Planning and Services" (Project 100) – a mechanism for allowing approval of projects and subsequent purchases that did not include the Contracting Officer in the approval chain. This allowed purchases to be made that were outside the scope of the ROC and without following the standard NASA procurement process. By charging purchases to Project 100 with ambiguous descriptions, KREMER was able to avoid scrutiny from NASA staff overseeing the ROC.

30. In November 2012, KREMER sent an e-mail to certain employees of Firm #1 in which KREMER requested Amazon gift cards be purchased on his behalf which he would purportedly use to purchase electronic reference books via Amazon.com for himself and other United States Government (USG) employees working at the WFF.



31. KREMER directed that these gift cards be procured from funds within Firm #1's ROC at WFF – specifically directing that they be billed to Project 100. KREMER informed these employees of Firm #1 that he was unable to purchase necessary electronic reference books for his staff with his USG credit card.

32. During the course of the WFF contract with Firm #1, KREMER made numerous requests that Firm #1 provide him with Amazon gift cards charged to Project 100. These gift cards were then, in fact, routinely procured for KREMER and hand-delivered to him at his office located within the WFF. In total, $7,000 in Amazon gift cards were procured for KREMER using ROC funds.

33. KREMER next purchased items of value for his personal use with the Amazon gift cards and had these items shipped to his residence located in Snow Hill, Maryland. None of the items of value purchased by KREMER with the Amazon gift cards related to work efforts conducted at the WFF. The items of value purchased by KREMER with the Amazon gift cards included, but were not limited to, beauty and skincare products, luggage, apparel and footwear, sporting equipment, cell phone accessories, and kitchen appliances.

D. <u>KREMER's Use of ROC Funds to Purchase Promotional Items</u>

34. From approximately December 2013 through March 2015, KREMER directed the purchase of various promotional items to be given to extracurricular organizations involving a member of KREMER's family and an associate of Kremer's at WFF. Most, if not all, these promotional items were charged to Project 100 and, as such, the funds for these materials came directly from the ROC. These items were not approved ROC educational or outreach expenditures.



35. In total, approximately $11,500.00 of ROC funds were used to purchase promotional items for these organizations.

E. <u>Extracurricular Club Donations</u>

36. Sub-contracting Firm #3 (Firm #3) is a company with whom Firm #1 subcontracted for range safety and other services at WFF. Beginning in approximately December 2013, KREMER sought the assistance of Firm #1 and Firm #3 in securing funds to help extracurricular organizations involving a member of KREMER's family and an associate of Kremer's at WFF. In turn, Firm #3 disbursed funds to these organizations.

37. Specifically, between December 2013 and April 2016, two extracurricular organizations involving KREMER's family member and an associate of Kremer's at WFF received a total of $32,000 in donations from Firm #3.



## CONCLUSION

38. The acts taken by the defendant, STEVEN ERIC KREMER, in furtherance of the offense charged in this case, including the acts described above, were done willfully and knowingly with the specific intent to violate the law. The defendant acknowledges that the foregoing statement of facts does not describe all of the defendant's conduct relating to the offense charged in this case nor does it identify all of the persons with whom the defendant may have engaged in illegal activities.

Respectfully Submitted,

G. ZACHARY TERWILLIGER
UNITED STATES ATTORNEY

By: /s/ V. Kathleen Dougherty
V. Kathleen Dougherty
Stephen W. Haynie
Attorneys for the United States
United States Attorney's Office
101 West Main Street, Suite 8000
Norfolk, VA 23510
Office - (757) 441-6331
Fax - (757) 441-6689
Email - steve.haynie@usdoj.gov
v.kathleen.dougherty@usdoj.gov



*United States v. Steven Eric Kremer*, 2:18cr163

<u>Defendant's Signature:</u>   After consulting with my attorney and pursuant to the plea agreement entered into this day between myself, the United States and my attorney, I hereby stipulate that the above Statement of Facts is true and accurate, and that had the matter proceeded to trial, the United States would have proved the same beyond a reasonable doubt.

_____
STEVEN ERIC KREMER
Defendant

<u>Defense Counsel's Signature:</u>   I am the attorney for defendant.   I have carefully reviewed the above Statement of Facts with him.   To the best of my knowledge, his decision to stipulate to these facts is an informed and voluntary one.

_____
Lawrence H. Woodward, Jr.
Counsel for Defendant

10